## SMITH v. SAENGER THEATRES CORPORATION.

### No. 5782.

Court of Appeal of Louisiana.
Second Circuit.

Feb. 6, 1939.

Charlies F. McMichael, of Alexandria, for plaintiff-appellant.

Gist & Thornton, of Alexandria, for defendant-appellant.

DREW, Judge.

Plaintiff, while a paid patron of the Saenger Theatre in the city of Alexandria, Louisiana, had occasion to go to the toilet. He entered the commode closet, immediately emerging therefrom covered more or less with lye. His head, the upper and lower lids of one eye, his abdomen and his genital organs were all burned with second degree burns. He has filed this suit against the Theatre for damages for these injuries.

Cases involving injuries such as the plaintiff sustained seldom reach courts, but when they do it is very distasteful to have to write opinions in them. After reading the testimony, viewing the four large photographs of a man's toilet and a like number of smaller photographs for a man's more or less mutilated genital organs, all of which is necessary in order to properly determine this case, we are left with a deep-seated feeling of nausea. But since courts cannot select the cases they are called upon to decide, any feeling of aversion we might have will be borne by us in silence.

The facts of the case, as disclosed by the record, are as follows:

On December 13, 1937, plaintiff purchased a ticket and entered the Theatre operated by defendant. He remained inside until the feature was over, at which time, in answer to a call of nature, he came out of the show and entered the toilet provided for the patrons, for the purpose of relieving his bladder. Preceding him into the toilet were two men whom plaintiff did not know.

The toilet consisted of one small room in which there was one urinal and in the corner of the room there was a commode closet. It was 34½ inches in width and from the inside of the door to the commode is 22 inches. The door to the closet is 27¼ inches wide. The walls forming the commode closet do not extend to the ceiling of the room. It is 6 feet, 5½ inches from the floor to the bottom of the casement over the commode closet. The casement consisted of three planed boards, one being used for the bottom and the other two for the inner and outer sides of the casement, making, so to speak, a trough over the door. To the left of the inside board of this casement from the floor was, therefore, 6 feet, 8½ inches.

Although plaintiff's weight and dimensions are not shown by the testimony, a picture of him which is in the record clearly shows him to be a large man, and the testimony discloses that he is 6 feet, one-half inch in height.

One of the men who preceded plaintiff into the toilet took possession of the urinal and plaintiff went into the commode closet. Immediately after the door closed, the two men who were in the toilet room heard a can fall and plaintiff emerged from the closet wiping his face and right eye. He wet his handkerchief in the lavatory and continued to wipe his eye. At that time there was a white substance of some kind on his head and shoulders. One of the men noticed the can on the floor, picked it up and smelled it, at which time he told plaintiff there was lye all over him. Plaintiff asked him to get somebody for him and this man, named Beaver, walked out, saw the Manager of the Theatre standing nearby and notified him that plaintiff had spilled lye on himself and that he (the manager) had better go inside and see what he could do. The Manager did as requested and, finding plaintiff covered with lye, sent him immediately to his (the Manager's) personal physician. Plaintiff's burns were treated and he was sent home.

It is evident that plaintiff did not know the powder or crystals which had fallen on him was lye until he was told by Mr. Beaver, and until he rubbed his face and eye with a wet handkerchief which immediately started the lye to burn him. It was at that time he asked that help be sent him.

Plaintiff contends that defendant was negligent in leaving this can of lye above the door where it could fall on anyone making use of the toilet, and that it is liable therefore to him for the damages caused him by the injuries he received.

Defendant's principal defense is that plaintiff carried the lye in with him and voluntarily put it on himself for the purpose of illegally and fraudulently recovering damages from it; and if that position be unsound, then it is not liable because the lye was placed there by some third person without the knowledge of defendant.

The lower court rendered judgment for plaintiff in the sum of $131, and both plaintiff and defendant have perfected appeals to this court.

█ In order to intelligently discuss the first defense raised, we are forced to detail the injuries received by plaintiff. He was wearing a shirt with a soft collar attached. The two top buttons were unfastened and the collar standing open. All of the burns were second degree burns. The one near the center top of the head was of a size between a fifty-cent piece and a dollar. There were burns on the face in the proximity of the right eye, burns on both the upper and lower lids of this eye, and on the abdomen near the navel. Also there were several places on the scrotum. In the skin in the middle or anterior surface of the scrotum there was a deep circular burn much more severe than the rest and of a size between a five-cent piece and a twenty-five cent piece. He also had burns on the corona on the head of the glans penis and burns on the foreskin.

There is no dispute as to the above stated injuries, and it can readily be seen that two of the most sensitive members of a man's physical makeup were the most severely injured. The two organs that men put forth more effort to protect, both voluntarily and involuntarily, than any other part of their anatomy. Yet we are asked by this defendant to find as a fact that plaintiff voluntarily and intentionally put lye on them. It is not

suggested or contended that plaintiff is insane or that he is abnormal. His testimony in the record reveals him to be a rational, normal male of the age of 25 years, and the testimony would have to be strong and the preponderance great for us to sustain this defense. The evidence defendant relies on to sustain this defense is weak and, in our opinion, almost if not entirely impeached. At the best, it is only suggestive.

It offered a man who drove a gasoline tank truck and who delivered gasoline to a station operated by one Dee Brady. This driver was unknown to plaintiff, yet he testified that at some time after December 13, 1937, the date of the accident and before trial, he knew not when, plaintiff in his presence told Dee Brady that he poured the lye on himself and that the insurance company had offered him $2,500, but his lawyer told him he could get more than that out of the case. A mere reading of this witness' testimony is sufficient to discredit it, if there was nothing else, but Dee Brady took the stand and swore positively that plaintiff never at any time or anywhere made the statement or said anything that could be so construed in his presence. We again say there is no evidence of insanity on the part of plaintiff and for him to have remarked in the presence of a stranger that which the truck driver said would indicate insanity of the first degree. We cannot believe a man would be smart enough to frame a case as this plaintiff is charged with doing, and then immediately thereafter go out and inform strangers that he had done so.

The next witness offered by defendant was a former employer of plaintiff, by whom he attempted to prove plaintiff's reputation for truth and veracity. The witness could not qualify and an objection to his testimony was sustained.

The defendant then offered one of plaintiff's neighbors, who was not on speaking terms with plaintiff, and who testified that about two or three weeks before the date of this accident, plaintiff had asked him whether there was an elevator or balcony in defendant's theatre and, when told there was a balcony but that it was for negroes, plaintiff stated in case a man got hurt going up or coming down that balcony, it would be an easy way to get some Christmas money. The record shows that plaintiff had been a regular customer of defendant's theatre for several years and was thoroughly familiar with all details of the building. He denied asking the question or making the statement attributed to him by the witness and said that at the time the witness spoke of, he was not on speaking terms with him. The lower court evidently gave no weight to the testimony and we will do likewise.

It attempted to prove by one other witness that plaintiff had made an effort to frame a case against him. The lower court ruled the testimony out, and correctly so. It is unnecessary for us to discuss this testimony and ruling.

The other evidence relied upon by defendant is that of the Manager and porter of the theatre to the effect that no lye was ever used in any of the departments of the theatre building. It then attempted to show that it was almost an impossibility to balance a can of lye on the 1-inch smooth, level surface of the inside board of the casement above the commode closet door, and that the toilet was inspected every half hour and had been 15 minutes before the accident, by the porter, and the can of lye was not in there at that time; that if a can had been there and was shaken off by the slamming of the door, it would have fallen back in the trough instead of onto the floor. The Manager testified that no lye had ever been purchased by defendant since he had been there, and if there had, he had no knowledge of it; and that he had never seen a can of lye around the theatre, since a soap powder was used for cleaning and pine oil for disinfecting. It would have been an easy matter for the Manager to produce in court the soap powder and pine oil he claims were used. No doubt, if his testimony is correct, there were containers with unused portions of this powder and oil about the building somewhere. He contented himself with his bare statement. There was no powder or oil in the toilet to be used there, and under the testimony of the Manager and the porter, the toilet was inspected and cleaned, if necessary, at least every hour. The Manager says every hour and the porter says every half hour. If this be true, it is perfectly natural that the cleaning powder and disinfectant would have been left in the toilet for convenience sake, if nothing else. We are of the opinion it was left there and that is why plaintiff was injured.

The Manager testified as to the inspection he made of the toilet on the afternoon of the accident as follows:

"Q. Between the hours of eleven and two, did you inspect it again? A. Yes, I

inspected it right after one, it's locked between 11 and 12.

"Q. And you inspected it at one? A. Yes, sir.

"Q. When you—did you look up over the door and see what was there? A. Well, the usual inspection, we are supposed to look everywhere.

"Q. But I say, did you look up there? A. Oh, yes."

He testified about placing the can of lye in the trough over the door and attempting to knock it out by slamming the door. That is not the contention of plaintiff and therefore has no bearing on the case. He further testified that it was impossible to balance the can on the 1-inch surface of the inner board of the trough over the door. This testimony is contrary to common knowledge and experience. Any ordinary size can can be placed on a smooth 1-inch surface, and it does not require any effort at balancing it. Furthermore, we are not informed as to the size of the can. Defendant's Manager picked it up after the accident. He described it as being an old one, without a label and more or less bent. At no time did he tell the court the size of it and did not offer it in evidence. Lye is put up in different size cans, and if this was a small one, the diameter of the bottom of it would not be more than 1½ inches or 1½ times as wide as the surface of the board on which it was setting.

The negro porter testified he never used lye to clean the commode, but failed to state what, if anything, he did use. He claims to have inspected the toilet every thirty minutes. When asked,— "When you go in there (the toilet) what do you go in there for? He answered,— "Go in there to see if the floor needs mopping, paper on the floor, see if the sewerage needs flushing."

He further testified that he went in there to keep the toilet clean; that he went in there immediately after the accident and saw no lye or other powder on the floor. This last statement indicates strongly that he is not a very close observer, or else has little regard for the truth, for it is admitted that the lye was there and on the floor at the time.

The lower court did not take the testimony of the Manager and porter as correct, and we are convinced he was correct in not accepting it. A negro's weakness for using lye in cleaning receptacles such as had to be cleaned at the theatre is well known, and it makes little difference whether the porter purchased the lye or that it was furnished him by the Manager. We are convinced that the lye was used in the toilet and that it was placed over the door by the porter for convenience; in case of further need for it. If it had been placed in the trough over the door, it would have been safe, but was set carelessly and negligently on the top surface of the inner board of the trough. Whether it was shaken from there by the closing of the door or by the body of plaintiff coming in contact with some part of the small enclosure around the commode, is immaterial. It was almost impossible for a man as large as plaintiff to enter the commode closet, as small as it was, without coming in contact with the closet itself.

As to the inspection of the toilet made by the Manager at eleven o'clock on the day of the accident, we think his testimony quoted above clearly indicates the kind he made. He does not claim that he entered the small commode closet and looked up on top of the casement for objects. He would have had to do so to discover the can. His inspection was no doubt only a casual glance at the general conditions to see if it was clean.

There was no reason suggested as to why any third person should have placed a can of lye in this toilet and it would be a far-fetched presumption to so hold.

We are convinced that plaintiff did not put the lye on himself and that his injuries are due to the negligence of defendant's servant acting within the course and scope of his employment. Ordinary care on the part of defendant would have prevented the accident and it owed to plaintiff such care.

The remaining question is the quantum.

The lower court awarded plaintiff $81 for loss of employment; $25 for a necessary operation to be performed; and $25 for mental pain and suffering, or a total of $131. This award is entirely inadequate to compensate plaintiff for his injuries. The only part of the award we consider correct is that for the loss of earning during the time he was disabled.

The case was tried four months after the date of the accident, and at that time all of plaintiff's injuries had healed, with the exception of the eye. There was at that time a scar one-fourth inch in diameter on each eyelid. They were not noticeable, except

on close inspection. The lower lid, due to the contraction of the scar, has pulled the lid ⅟₃₂d of an inch away from the eye and all agree it will be pulled slightly farther away as the scar continues to contract. Dr. Noel Simmonds, an eye specialist used by defendant, testified about the lower lid as follows:

"Q. Now, with reference to the scar under the—on the under lid, what is the condition of that scar at the present time, Doctor? A. The scar is—how do you mean? It's the same condition as the others.

"Q. Is that scar causing plaintiff any disability and if so, what? A. Yes, that scar has contracted some and while it may contract a little·more, I doubt if it will, as it has been something over four months now; however, it may contract a slight bit more; now this contraction has pulled the lower lid slightly away from the eye, roughly between a ⅟₃₂d—about ⅟₃₂d of an inch.

"Q. Is that noticeable in passing? A. Well, you have to look to see it.

"Q. Don't you get rather close to him to observe that? A. Yes, sir.

"Q. Now is that a serious disability, Doctor? A. No, sir, it's not a serious disability; it can be corrected.

"Q. Is it a serious operation to correct it? A. No, sir.

"Q. Would it be very painful an operation to correct it? A. Not especially, he would be anesthetized very well.

"Q. You don't have to give a general anesthetic? A. No, sir.

"Q. You would give him a local? A. Yes, sir.

"Q. There wouldn't be very much danger? A. Well, slight danger, it's relatively minor."

On cross-examination, he testified:

"Q. How do you say you would correct the lower right eyelid? A. He would need what is called a Siegler caudery puncture on the inner side, toward the nose. .

"Q. You mean there would have to be an operation, don't you, Doctor? A. Well, it's not exactly an operation, use an electric needle and you create a little scar on the inside to pull against the scar on the outside.

"Q. The lower right lid is at present pulled down? A. Yes, it's not in contact with the eye.

"Q. Can you state whether or not that scar has contracted all that it's going to? A. Those scars usually contract the maximum in the first four months and very little after that, but it's not very much.

"Q. Well, then you would say that in Mr. Smith's case, Mr. Smith's present condition in all probability it's probable that the lid will be pulled down a little bit more yet? A. Possibly a little bit more, yes, sir."

He stated that the cost of such an operation would be about $25. This is the amount the lower court allowed for the injury to the eye. He did not take into consideration the probability of the operation not being successful and the inconvenience and suffering which will be caused by creating a wound and scar tissue on the inside of the eye-lid. If the operation is not performed or is unsuccessful, plaintiff's eye will always give him trouble. In the condition it is now, it will result in causing tears to unnecessarily form, requiring a more or less constant wiping of the eye, which in turn will cause irritation and certainly annoyance. The award by the lower court for this injury is entirely inadequate, as was that of $25 for pain and suffering. The tender, sensitive portions of plaintiff's body which were burned caused him much pain and suffering. The treatment given him by the doctors furnished by defendant called for no bandages, therefore, the wounds were constantly coming in contact with his clothes. Common sense and reason prevent us from accepting the testimony of one doctor that practically all pain would disappear after twenty-four hours. This testimony is also contrary to the great preponderance of the testimony.

We are of the opinion that a fair award in the case and one that will do justice between all parties is the sum of $750.

It therefore follows that the judgment of the lower court is amended by increasing the award to plaintiff from $131 to seven hundred and fifty and No/100 ($750.00) dollars; and as amended the judgment of the lower court is affirmed with costs.